Christopher Wiest (admitted *pro hac vice*)
KY Bar No. 90725; OH Bar No. 0077931
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (v)
859/495-0803 (f)
*chris@cwiestlaw.com*

Thomas Amodio, ABA No. 8511142
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, AK 99501
Telephone: (907) 222-7100
Facsimile: (907) 222-7199
*tom@reevesamodio.com*
Co-counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | | |
|---|---|---|
| ALASKA LIBERTARIAN PARTY | : | |
| AND | : | |
| JON WATTS | : | |
| Plaintiffs | : | |
| v. | : | |
| GAIL FENUMIAI | : | **PLAINTIFFS' EMERGENCY MOTION** |
| In her official capacity as Director of Elections | : | **FOR PRELIMINARY INJUNCTION WITH DECLARATION OF SCOTT KOHLHAAS IN SUPPORT** |
| AND | : | |
| KEVIN MEYER | : | CIVIL ACTION NO. |
| In his official capacity as Lt. Governor | | 3:20-cv-127 |
| | : | |
| Defendants | | |
| | : | |

1

## I. Introduction

Plaintiffs, the Alaska Libertarian Party ("ALP") and Jon Watts, by and through Counsel, move this Court for a preliminary injunction under FRCP 65, enjoining defendants from enforcing A.S. 15.30.025 as to them, in this election cycle. They challenge the signature gathering requirements in the middle of a global pandemic. In support, they rely on the verified Complaint, verified by Mr. Watts in this matter, and upon the declaration of Scott Kohlhaas.

*<u>The petition deadline for their Presidential ticket is August 5, 2020. Plaintiffs respectfully request emergency relief either: (i) reducing or eliminating that requirement, and/or (ii) extending the deadline.</u>* The harm is ongoing: Plaintiffs continue to attempt to comply with the statutory signature gathering requirements by attempting to gather signatures (with limited success) in the middle of a global pandemic.

## II. Facts

There are three methods for a political party to obtain party ballot access insofar as the Presidential race is concerned: <u>first</u>, that they be recognized as a "political party" under A.S. 15.80.10(27) by achieving 3% of the vote in the preceding Governor's race, or, if that race is not on the ballot, the United States Senate race is used, and if that race is not on the ballot, then the United States House race is used; <u>second,</u> that they be recognized as a "political party" under A.S. 15.80.10(27) by having registered voters equal to 3% of the vote in the preceding Governor's race; or <u>third</u>, that they obtain "limited political party" status under A.S. 15.30.025, by submitting a petition with signatures equal to 1% of the votes cast in the preceding Presidential election in Alaska at least 90 days before the general election (and then maintaining that status with votes equal to 3% of the number of votes cast in the next election for President) under A.S. 15.30.025. (Pl.'s Verified Compl, RE#1, ¶8).

Prior to 2016, the ALP qualified as a political party, because its 2014 Gubernatorial candidate received more than 3% of the vote for Governor. *Id.* at ¶9. In 2016, the ALP retained party status, because its candidate for United States Senate received 90,825 votes, or 29.16% of the vote. *Id.* at ¶10.

Also in 2016, the total votes cast at the preceding Presidential election in Alaska, which was 2016, was 318,608. *Id.* at ¶11. The Libertarian candidate, Gary Johnson, received 18,725 (or 5.88%). *Id.* The total votes cast at the preceding Governor's election in Alaska, which was in 2018, was 283,134 votes, and the Libertarian candidate in that race, William Toien, received 5,402 votes (or 1.91%). *Id.* at ¶12. This caused the ALP to lose its party status. *Id.*

The 2020 Election Cycle

In early 2020, COVID-19 hit the United States, creating a significant public health crisis. *Id.* at ¶13. In the same period, starting on March 11, 2020, with Governor Dunleavy's public declaration of emergency, the State of Alaska began issuing a number of public health mandates.[1] *Id.* at ¶14. Among other things, public libraries, museums, and archives were closed on March 16, 2020; bars, breweries, restaurants, food and beverage kiosks or trucks, and other establishments serving food or beverages within the State of Alaska were closed to the public for dine-in service on March 17, 2020; distancing measures were ordered for persons who traveled outside of Alaska on March 17, 2020; elective medical procedures were postponed on March 19, 2020; business, congregations, or gatherings in the Fairbanks North Star Borough and the Ketchikan Gateway Borough were cancelled on March 21, 2020; all schools were cancelled on

---

[1] See https://covid19.alaska.gov/health-mandates/ (last visited 5/29/2020). The Court can take judicial notice of all of these public declarations. *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012)

3

March 20, 2020; a social distancing/stay at home order was issued March 28, 2020; and an intrastate travel ban was put into place March 28, 2020. *Id.*

On Friday April 24, 2020, Alaska began a phased re-opening plan. That plan required social distancing between persons who are not of the same household. *Id.* at ¶15. As of May 22, 2020, Alaska began additional re-opening procedures, but still strongly encouraged social distancing and the wearing of masks.[2] *Id.* at ¶16. The May 22, 2020 re-opening orders are the currently applicable orders.[3] *Id.*

In 2020, the Libertarian Party nominated its candidates for President and Vice President the weekend of May 22, 2020 through May 24, 2020, via an online convention for the first time in its history in light of COVID-19. *Id.* at ¶17. The selection of these candidates is the precursor to ballot access efforts in many states, since fundraising occurs in connection with the nomination. *Id.* Those ballot access fundraising efforts have been, and continue to be, depressed due to COVID-19. Dr. Jo Jorgensen, and Spike Cohen were selected as the nominees for President and Vice President, respectively. *Id.*

The Libertarian National Committee and the ALP engaged a local signature gatherer, Scott Kohlhaas, to lead the petition and signature gathering drive in Alaska. *Id.* at ¶18. Mr. Kohlhaas began that effort approximately three weeks ago, to secure Limited Party Status for the ALP, and to place the Jorgensen/Cohen ticket, and the ALP electors, on the ballot for 2020. (Pl.'s Verified Compl, RE#1, ¶19; Declaration Kohlhaas, attached hereto).

Mr. Jon Watts, the ALP Chair, also sought concessions from the Defendants in light of COVID-19; for their part, the Defendants offered to permit the ALP to gather signatures via an

---

[2] https://covid19.alaska.gov/wp-content/uploads/2020/05/05222020-Phase-III-IV-016-Attachment-N-Revised-Social-Religious-and-Other-Gatherings.pdf (last visited 5/29/2020)
[3] https://covid19.alaska.gov/reopen/ (last visited 5/29/2020).

4

online method.  (Pl.'s Verified Compl, RE#1, ¶20).  The ALP sought additional concessions from Defendants, including a reduction of the signature requirement, or an extension of the time to petition, but Defendants have refused, instead placing Plaintiffs, and the general public, at additional risk to the spread of COVID-19 through petition gathering efforts. (Pl.'s Verified Compl, RE#1, ¶21).  Defendants denied them that relief.

Further, despite having attempted to do so via its website, email list, and other methods, the ALP has gathered less than 50 signatures via online canvassing of voters in the last 60 days. (Pl.'s Verified Compl, RE#1, ¶22; Declaration, Kohlhaas).  Regular venues for the gathering and collection of signatures are shut down or severely curtailed.  (Pl.'s Verified Compl, RE#1, ¶23; Declaration, Kohlhaas).  Furthermore, people that Mr. Kohlhaas and other petitioners have approached for signatures are appropriately apprehensive to approach them and sign a petition in light of the COVID-19 outbreak.  (Pl.'s Verified Compl, RE#1, ¶24; Declaration, Kohlhaas).

Mr. Kohlhaas, on May 28, 2020, petitioned for 3.5 hours (3 PM to 6:30 PM) in front of the Carrs grocery store in Eagle River, Alaska, which is part of the Municipality of Anchorage (MOA).  (Pl.'s Verified Compl, RE#1, ¶22; Declaration, Kohlhaas).  Working only on a Libertarian Limited Political Party petition, he gathered 56 signatures in that time, which is 16 signatures per hour.  *Id.*  Normally, Mr. Kohlhaas would gather closer to 35 signatures per hour at that same location during a "dinner hour" shift which is the most heavily trafficked.  *Id.* People have displayed observable cues that they are not comfortable being approached with the outbreak of COVID-19.  *Id.*

For a successful petition drive of 3,212 valid signatures, the ALP would gather 30% to 40% above that threshold, or approximately 5,000 "raw" signatures, to account for invalid signatures.  (Pl.'s Verified Compl, RE#1, ¶23; Declaration, Kohlhaas).  Also, for Kohlhaas and

5

the other petition gatherers, it is physically far more difficult to petition while wearing a mask and petitioners took breaks to use hand sanitizer every 15 or 20 minutes. (Pl.'s Verified Compl, RE#1, ¶24; Declaration, Kohlhaas).

Kohlhaas and the ALP have hired eight other people to help gather signatures in Alaska. Petition team recruitment and retention right now is very difficult in light of COVID-19. (Pl.'s Verified Compl, RE#1, ¶25; Declaration, Kohlhaas). The results they have seen have been terrible. *Id.* They gathered 149 signatures over the last 10 days to 2 weeks. *Id.* In a typical year, they would expect at least 1,000 per week for this size team, in this same period. *Id.*

Overall, based on the longtime experience gathering signatures of Mr. Kohlhaas and others, it is over five times as hard to gather signatures right now, and, the Alaska requirement that is normally moderately burdensome in terms of signature gathering is severely burdensome in light of the circumstances on the ground with COVID-19. (Pl.'s Verified Compl, RE#1, ¶26; Declaration, Kohlhaas). Finally, Plaintiff Watts delivered paperwork to Defendant Fenumiai, without the required 1% of signatures appended to it for limited party status, and Defendant Fenumiai refused to accept the same to place the Libertarian Party's 2020 Presidential and Vice-Presidential ticket and electors on the ballot as a limited party. (Pl.'s Verified Compl, RE#1, ¶27).

### III. Law and Argument

#### A. Preliminary Injunction Standard

The issuance of preliminary injunctive relief rests upon consideration of four factors: [1] the likelihood of the plaintiffs' success on the merits; [2] the threat of irreparable harm to the plaintiffs if the injunction is not imposed; [3] the relative balance of this harm to the plaintiffs and the harm to the defendants if the injunction is imposed; and [4] the public interest. *Los*

*Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200-01 (9th Cir. 1980).

The Ninth Circuit has encompassed these factors into a two-prong test. To qualify for preliminary injunctive relief, the moving party must show "either [1] a likelihood of success on the merits and the possibility of irreparable injury, or [2] that serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's] favor." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999), *quoting, Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir. 1992). "These two formulations represent a continuum in which the required degree of irreparable harm increases as the probability of success decreases." *America West Airlines, Inc. v. National Mediation Board*, 119 F.3d 772, 777 (9th Cir. 1997) (internal quotations omitted).

Preventing injury that cannot later be repaired is precisely the kind of irreparable injury that warrants preliminary injunctive relief. *See S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148 (9th Cir. 1998) (finding irreparable injury where ordinance imposed unreasonable time, place and manner restriction on protected speech), *quoting, Elrod v. Burns*, 427 U.S. 347, 373, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976) ("the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury"); *Foti v. City of Menlo Park*, 146 F.3d 629, 643 (9th Cir. 1998) (same).

Numerous cases hold that violation of a constitutional right, in and of itself, constitutes irreparable injury. *See Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528-29 (9th Cir. 1993) (constitutional rights), *cert. denied*, 511 U.S. 1030 (1994); *Chalk v. United States District Court*, 840 F.2d 701, 710 (9th Cir. 1988) (civil rights); *Zepeda v. United States Immigration and Naturalization Service*, 753 F.2d 719, 727 (9th Cir. 1983).

7

While this aspect of harm is related to the merits of a plaintiff's claim, even where the plaintiff has not demonstrated it is likely to prevail but instead raises serious questions on the merits, it establishes a distinct possibility that its constitutional rights would be violated absent the preliminary injunction. *Sammartano v. First Judicial District Court in, for County of Carson City*, 303 F.3d 959, 2002 WL 1963341, *13 (9th Cir. 2002) ("Even if the merits of the constitutional claim were not clearly established at this early stage in the litigation, the fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury." (Internal quotations omitted)). Irreparable injury need not be established with certainty or even high probability; the distinct possibility of such harm is sufficient to establish a "serious threat of irreparable injury" supporting preliminary injunctive relief. *See, e.g., id.; Foti*, 146 F.3d at 643.

**B. Plaintiffs have demonstrated a likelihood of success on the merits**

Before undertaking an analysis of the merits of the Plaintiffs' claims, it is important to note that this lawsuit, and the relief that Plaintiffs seek are narrow: Plaintiffs do not seek to facially challenge A.S. 15.30.025, or the general ballot access scheme of Alaska. In normal election years, these requirements pose modest burdens that Plaintiffs have historically and routinely been able to achieve. But 2020 is different, and what was a modest challenge in normal years poses an unsurmountable challenge this year. Plaintiffs thus bring an as-applied challenge to A.S. 15.30.025 in light of both governmental restrictions and shutdowns of public places, as well as the situation on the ground with COVID-19.

Despite attempting to circulate petitions online, for over a month, it is readily apparent that the signature threshold cannot be met by the August deadline (or at all) in 2020 if Plaintiffs were to circulate solely online. In person signature gathering is thus necessary.

8

Plaintiffs brought in a team of eight signature gatherers, and, despite reasonable diligence, have only been able to gather 149 signatures in 10 days. (Pl.'s Compl., RE#1, ¶25). Mr. Kohlhaas, who is the most seasoned and experienced of these signature gatherers, was able to gather only 56 signatures in a busy grocery store (perhaps the only reasonably crowded location that is open) in a three-and-a-half-hour effort. *Id.* The deadline is August 5, 2020.

Under the prevailing U.S. Supreme Court cases of *Anderson v. Celebrezze*, 460 U.S. 760 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), courts are first instructed to look at the burden of the requirement. Where burden is severe, strict scrutiny applies. *Id.* Where the burden is "more than minimal" the flexible approach is used, which weighs the government's asserted interest against the means by which it has chosen to pursue it. *Id.*

The Ninth Circuit has held that the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, "reasonably diligent" candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so. *Libertarian Party of Washington v. Munro*, 31 F.3d 759, 761-762 (9th Cir. 1994) (*quoting Storer v. Brown*, 415 U.S. 724, 742 (1974)).

Typically, to determine the severity of the burden, the Ninth Circuit has said that past candidates' ability to secure a place on the ballot can inform the court's analysis. *See id.* at 763. That analysis, however, sheds little light on the situation _this_ year. This year, the situation on the ground is unique. The District Court in Nevada recently recognized this fact. *Fair Maps Nev. v. Cegavske*, 2020 U.S. Dist. LEXIS 94696 (D. Nevada May 29, 2020). It looked to see if anyone else had qualified or submitted a petition under present circumstances. *Id.* That analysis is undoubtedly correct. And here, no one in Alaska _has_. And unless this Court takes action, it is highly unlikely that anyone in Alaska _will_.

9

In the past two months, numerous federal courts have addressed ballot access or voting requirements which, in normal times, are typically viewed as reasonable or appropriate even though they are moderately burdensome, but which have become unreasonable and oppressive in light of the COVID-19 outbreak. *Esshaki v. Whitmer*, 2020 U.S. App. LEXIS 14376 (6th Cir. 2020) (concluding petition gathering with the presence of COVID-19 and state orders regarding same created a severe burden and ordering relief); *Libertarian Party of Ill. v. Pritzker*, 2020 U.S. Dist. LEXIS 71563 (ILND 2020) (order permitting previously qualified parties and loosening the signature requirements in light of insurmountable hurdle of COVID-19); *Garbett v. Herbert*, 2020 U.S. Dist. LEXIS 75853 (Dist. Utah, 2020) (reducing signature requirements in light of COVID-19 outbreak); *Democratic Nat'l Comm. v. Bostelmann*, 2020 U.S. Dist. LEXIS 48394, 2020 WL 1320819 (W.D. Wis. 2020) (extending deadline in light of "excruciating dilemma that will soon be faced by eligible voters . . . [to] either venture into public spaces, contrary to public directives and health guidelines or stay at home and lose the opportunity to vote.").

In a normal year, Mr. Kohlhaas and his team would have completed their Alaska petition drive in two to three weeks, and then moved on to other states on behalf of the Libertarian National Committee. As it stands, and without relief from this Court, it appears that they will need to spend the entire summer in Alaska, and even then perhaps not gather enough valid signatures to place the ticket on the ballot. The math on their progress to date is not favorable. At the rate that they have been proceeding, 149 signatures in 10 days, and with approximately 60 days until that deadline, it appears that even with an eight-person signature gathering team, they might at best gather only 905 signatures.

Again, what would typically trigger a flexible analysis and pass constitutional muster—in a normal year at least—does not trigger a flexible analysis given the situation on the ground in

10

Alaska with the COVID-19 outbreak. Application of the challenged statutes, as applied this year, with the situation now presented by the pandemic and as experienced by reasonably diligent signature gatherers, demonstrates a severe, constitutionally unacceptable burden.

### C. Remedies

Having demonstrated a likelihood of success on the merits, and having demonstrated that the other factors are met because Constitutional rights are at stake, *S.O.C., Inc.*, 152 F.3d 1136, 1148; *Burns*, 427 U.S. 347, 373; *Foti*, 146 F.3d 629, 643, Plaintiffs have demonstrated that they are entitled to preliminary injunctive relief. That turns to remedy.

As remedy, Plaintiffs seek excusal from the signature requirement in its entirety, or, in the absence of that, they respectfully request a reduction in the number of valid signatures that they must submit. Given what Mr. Kohlhaas has observed, and specifically his testimony that it is over five times as difficult as normal to collect signatures, Plaintiffs suggest that a signature threshold of 20% of the normal threshold, or 638 signatures—for the 2020 election cycle only—would also be an appropriate remedy. They further seek, or alternatively seek, an extension of the deadline under which they must turn in signatures.

### IV. Conclusion

Plaintiffs respectfully request the preliminary injunctive relief noted.

Respectfully Submitted,

/s/Christopher Wiest_____
Christopher Wiest (admitted *pro hac vice*)
KY Bar No. 90725; OH Bar No. 0077931
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
859/495-0803 (f)
*chris@cwiestlaw.com*

11

/s/Thomas Amodio
Thomas Amodio, ABA No. 8511142
REEVES AMODIO LLC
500 L Street, Suite 300
Anchorage, AK 99501
Telephone:  (907) 222-7100
Facsimile:  (907) 222-7199
*tom@reevesamodio.com*
Co-counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that I have served the foregoing upon all Counsel or parties, by: (i) filing a copy of the foregoing in the Court's CM/ECF system; and (ii) serving a copy of the foregoing on the Defendants and upon the Alaska Attorney General, by express overnight mail, this 11 day of June, 2020.

/s/Christopher Wiest