KEVIN G. CLARKSON
ATTORNEY GENERAL

Margaret Paton-Walsh (AK Bar No. 0411074)
Cori Mills (AK Bar No. 1212140)
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov
cori.mills@alaska.gov

Attorneys for the State of Alaska

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| ALASKA LIBERTARIAN PARTY and JON WATTS,<br><br>Plaintiffs,<br><br>v.<br><br>GAIL FENUMIAI, in her official capacity as Director of Elections, KEVIN MEYER in his official capacity as Lt. Governor,<br><br>Defendants | Case No. 3:20-cv-00127-JWS<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND CROSS-MOTION TO DISMISS** |

## I. INTRODUCTION

In this type of "as-applied" constitutional challenge requesting extraordinary relief from otherwise constitutional ballot access requirements, the facts determine the outcome. Here, the critical facts are that Governor Dunleavy's stay-at-home order was lifted before the Alaska Libertarian Party (ALP) started gathering in-person signatures,

and—assuming ALP's assertions about signature gathering efforts are true—all ALP had to do was gather nine signatures per circulator per day to meet Alaska law's minimal threshold to get on the ballot. These facts do not justify extraordinary relief.

Alaska law on signature gathering is already quite permissive. Unlike the stricter ballot access requirements in other states requiring in-person signature gathering during a limited period of time, Alaska law already allows for signatures to be transmitted by scanned copies over email, and the political group seeking ballot access can start gathering those signatures as soon as the previous presidential election has been held.[1] Although COVID-19 is making a lot of tasks and legal requirements more burdensome—including signature gathering—Alaska law fortunately already contains the flexibility and advanced timelines needed to accommodate reasonable ballot access for minority political parties during the current pandemic.

The Court should grant the Defendants' ("the State") motion to dismiss and deny ALP's motion for a preliminary injunction.

## II. FACTS

Alaska law provides two different paths for political parties and political groups to access the presidential general election ballot.[2] The only path at issue in this lawsuit

---

1 *See* AS 15.30.025.

2 AS 15.30.020-.025 (allowing a "political party," defined as a party having received three percent of the vote in the last general election or a party having registered members equal to three percent of the vote, to access the general election ballot through Alaska's primary election, and allowing other political groups to be recognized as "limited political parties" by submitting a petition).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 2 of 19

involves recognition as a "limited political party."[3] In order to be recognized as a "limited political party" and select candidates for electors for the presidential general election, a group must submit a petition "at least 90 days before" the general election that is "signed by qualified voters of the state equaling in number at least one percent of the number of voters who cast ballots for President at the last presidential election."[4] For this election cycle, the deadline for submitting the petition is August 5, 2020, and the political groups must gather at least 3,212 qualified signatures to earn limited political party status. [Dkt. 1 at 6, ¶ 26] Importantly, there is no statutory start date for gathering signatures; a party seeking limited political party status can gather signatures and submit them any time before or on the 90th day before the election.[5]

In this case, ALP seeks to get on the 2020 presidential general election ballot through recognition as a limited political party because it lost political party status after the 2018 election. [Dkt. 1 at 3, ¶ 12] As of November 3, 2019, ALP had 7,251 registered voters affiliated with the party. [Dkt. 1 at 1, ¶ 1] Because Alaska law does not restrict the timeline for signature gathering, nothing prevented the party from beginning to gather signatures to regain party status immediately after it lost that status in 2018.

On March 11, 2020, Governor Dunleavy issued a disaster declaration due to the COVID-19 pandemic. [Dkt. 1 at 4, ¶ 14] Although a number of health mandates and health advisories have been issued, only three are truly relevant for purposes of this

---

3 AS 15.30.025.

4 *Id*.

5 *Id*.

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 3 of 19

lawsuit. On March 28, Governor Dunleavy issued a social distancing/stay at home mandate; on April 24, he allowed non-essential businesses to open to the public under stringent guidance; and on May 22, he lifted the social distancing/stay at home mandate allowing all businesses in Alaska to reopen.[6] [Dkt. 1 at 4, ¶¶ 14, 16] As alleged in the complaint, "the May 22, 2020 reopening orders are the currently applicable orders." *Id.*

ALP alleges it began gathering signatures through in-person circulators for its petition around May 24, 2020, after the national Libertarian Party Convention selected the party's presidential nominee. [Dkt. 1 at 4-5, ¶¶ 17, 19] This gave the party a 79-day self-imposed window from May 24 to August 5 to gather the signatures it needed (nothing prevented the party from beginning to gather its signatures more than a year earlier, when it lost political party status following the 2018 election. [Dkt. 1 at 3, ¶12]). Thus, the party had to collect an average of 41 valid signatures per day or an estimated 64 "raw" signatures[7] per day to account for potentially invalid signatures.[8] ALP also

---

6 These two mandates and the one action rescinding the prior mandates can be found at the following hyperlinks: https://gov.alaska.gov/wp-content/uploads/sites/2/03272020-SOA-COVID-19-Health-Mandate-011.pdf; https://gov.alaska.gov/wp-content/uploads/sites/2/03272020-SOA-COVID-19-Health-Mandate-011.pdf; and https://covid19.alaska.gov/wp-content/uploads/2020/05/05192020-Alaskas-Plan-Forward-Final.pdf.

7 In any signature-gathering effort, the Division of Elections will find that some percentage of the signatures collected are not the signatures of qualified Alaska voters. ALP uses the phrase "raw signatures" to describe all of the signatures gathered, in contrast to the signatures subsequently validated by the Division. Dkt. 5 at 5.

8 79 days x 41 signatures = 3239 signatures; 79 days x 64 signatures = 5056 signatures. *See* Dkt. 1 at 6, ¶ 26. The Division notes that two recently-filed initiative petitions—which had signature qualification rates of 87 and 88 percent—suggest that the party is unduly pessimistic about the likely number of invalid signatures. Declaration of Gail Fenumiai at 2-3, ¶¶ 11-12.

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 4 of 19

asked the Division of Elections to simply "reinstate" its status as a limited political party in July of 2019 even though it had lost its limited political party status in 1992. [Declaration of Gail Fenumiai (Decl. Fenumiai) at 1-2, ¶ 2] But the Division of Elections confirmed in its response dated August 1, 2019 that the Division has no authority to "reinstate" limited political party status upon request; rather, ALP needed to submit a limited political party petition like every other political group that fails to meet the threshold for political party status. [Decl. Fenumiai at 1-2, ¶ 2]

By the end of May 2020, ALP had nine petition circulators working to gather signatures in support of its candidates—Scott Kohlhaas, an experienced circulator [Dkt. 5-1 at 1, ¶ 2],[9] and eight others, hired by Mr. Kohlhaas. [Dkt. 5-1 at 2, ¶ 10] Counting only June, July, and the first four days of August,[10] these nine circulators had 65 days to gather the 3,212-5,000 signatures they need, or an average of 50-77 signatures a day. This means that each circulator needs to collect an average of 6-9 signatures per day. Mr. Kohlhaas reports that he collected 56 signatures in a 3.5-hour period outside a grocery store in Eagle River on May 28. [Dkt. 5-1 at 2, ¶ 7]

Although the Division of Elections is unaware of any other political groups seeking limited political party status for the presidential election, the Division has received five petitions with signatures from candidates seeking nomination by petition, which also requires signature gathering. [Decl. Fenumiai at 2, ¶ 5] Such candidates must

---

[9] Mr. Kohlhaas executed his affidavit—Dkt. 5-1—on May 29, 2020.

[10] Because the petition has to be submitted by August 5, 2020, the party would likely need to complete its signature gathering by the end of August 4.

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 5 of 19

submit signatures of qualified voters equivalent to one percent of those who voted in the district for which the nomination is being sought.[11] Of the five petitions submitted, four were submitted after Governor Dunleavy issued the disaster declaration, and one was submitted in October 2019. [Decl. Fenumiai at 2-3, ¶¶ 5-9] To date, four of the five petitions submitted have been found to contain sufficient qualified signatures to go on the ballot. [Decl. Fenumiai at 2, ¶ 5]

Because of the federal Uniformed and Overseas Citizens Absentee Voting Act, the Division of Elections must send general election absentee ballots to certain voters 45 days before the election, which is September 19.[12] To meet that deadline, the Division must send the final general election ballot to the printer by September 1. [Decl. Fenumiai at 4, ¶ 15] As a result, the current signature-gathering deadline of August 5 leaves the Division of Elections less than 30 days to review the signatures for a limited political party petition and finalize the general election ballot. During this period, the Division must also conduct the primary election, which is scheduled for August 18.

## III. LEGAL STANDARDS

The State moves the Court to dismiss ALP's complaint for lack of standing under Rules 12(b)(1) and 12(b)(6). When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the

---

11 AS 15.25.160-.170.

12 42 U.S.C. 1973ff *et seq*.

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 6 of 19

defendant's motion to dismiss.[13] When the defendant asserts a failure to state a claim under Rule 12(b)(6), the allegations must "plausibly suggest an entitlement to relief."[14] In either case, the Court should assume the factual allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor.[15] But the Court should not accept the truth of legal conclusions cast as factual allegations.[16]

The State also opposes the ALP's preliminary injunction motion on the merits. "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."[17] It is ALP's burden to show that this drastic remedy is warranted.[18] ALP must show that the following four factors are met: (1) ALP is likely to succeed on the merits, (2) ALP is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in ALP's favor, and (4) an injunction is in the public interest.[19]

If ALP cannot show it is likely to succeed on the merits, the Court should then

---

13 *Tosco v. Comtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2000) (citing 28 U.S.C. § 1331, 1332(a)).

14 *Ashcroft v. Iqbal*, 556 U.S. 662, 681, 129 S.Ct. 1937 (2009).

15 *Doe v. See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

16 *Id*.

17 *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted). *See also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

18 *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

19 *Winter*, 555 U.S. at 20.

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 7 of 19

look to see if ALP can show "serious questions going to the merits."[20] If so, "a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,'" the plaintiff will suffer irreparable harm and the injunction is in the public interest.[21]

ALP also faces a heightened burden in this case because it is seeking a mandatory preliminary injunction, meaning an order requiring the Division to act as opposed to refrain from acting. A mandatory preliminary injunction should not be granted "unless the facts and law clearly favor the plaintiff."[22] This is especially true here given that the U.S. Supreme Court has expressly cautioned against making changes midway through an election cycle, and in this case, the primary election is just two months away.[23]

## IV. ARGUMENT

### A. ALP lacks standing because no state action is alleged to have harmed ALP's signature gathering efforts, which began after Governor Dunleavy lifted his stay-at-home order.

Article III standing requires a plaintiff to establish three things: "(1) he must have directly suffered an injury in fact, (2) the injury must be fairly traceable to the defendant's conduct, and (3) a favorable court decision must be likely to redress the injury."[24] Here, ALP has not established an injury in fact because no evidence suggests

---

20 *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

21 *Id*. (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

22 *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986).

23 *Purcell v. Gonzalez,* 549 U.S. 1, 4, 127 S.Ct 5 (2006).

24 *Rubin v. City of Santa Monica,* 308 F.3d 1008, 1019 (9th Cir. 2002).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 8 of 19

that the party cannot with due diligence collect the needed signatures before the August 5 deadline. Nor has ALP established an injury that is "fairly traceable to" the State's conduct, because the State lifted its stay at home order on May 22 and there are currently no state-imposed restrictions that limit the party's signature-gathering efforts.

As for the injury-in-fact requirement, ALP's complaint and its motion for preliminary injunction rest on a false predicate: the assumption that the party cannot realistically hope to gather sufficient signatures to get its presidential ticket on the general-election ballot. But ALP's numbers do not support this contention. A goal of nine signatures per circulator per day is hardly onerous, especially when a single circulator—albeit an experienced one—collected 56 signatures in under four hours. [Dkt. 5-1 at 2, ¶ 7.]

As for the fairly-traceable requirement, to the extent that ALP may find it more difficult than usual to gather signatures in the context of the COVID-19 pandemic, that difficulty is not "fairly traceable" to state action. The State lifted its social distancing/stay-at-home mandate on May 22—before ALP even began trying to collect signatures. Thus, any difficulty that ALP is experiencing is not a product of state restrictions. As the Sixth Circuit recently noted in a similar case, "First Amendment violations require state action. So we cannot hold private citizens' decisions to stay home

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 9 of 19

for their own safety against the State."[25]

Because ALP has not shown any injury nor any state action harming its signature-gathering efforts, the Court should dismiss this case for lack of standing.

**B. ALP's complaint fails to state a claim for which relief may be granted and should therefore be dismissed pursuant to F.R.C.P. 12(b)(6).**

In addition to lack of standing, the Court may also dismiss the complaint for failure to state a claim, because ALP fails to allege a viable ballot access claim. The alleged burden on ballot access described in the complaint and motion for preliminary injunction is de minimus: at most, it amounts to a requirement that the party's nine signature gatherers collect an average of nine signatures a day. This modest target is well within their abilities, as established by the affidavit of Mr. Kohlhaas. [Dkt. 5-1 at 2, ¶ 7.]

Given such a de minimis burden, the State's well-established and judicially-recognized interests in reducing voter confusion and ballot over-crowding are more than sufficient to justify its reasonable ballot-access restrictions. These principles are discussed below in the State's argument against ALP's motion for preliminary injunction. For the same reasons ALP cannot make the merits showing necessary to justify a preliminary injunction, it also fails to state a claim for relief. Alaska's ballot access laws remain constitutional even in the unique circumstances of the COVID-19 pandemic; and this Court should dismiss ALP's complaint for failure to state a claim.

---

25 *Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) (internal citations omitted); *see also Clark v. Edwards*, 2020 WL 3415376 (D. M.D. Lousiana 2020) (holding 10 different plaintiffs lacked standing on the grounds that "fear of the virus" was not a sufficient injury-in-fact nor fairly traceable to state action).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 10 of 19

### C. ALP is not entitled to a preliminary injunction.

Because an injunction is such an extraordinary remedy, ALP must show not only that it is likely to succeed on the merits of its claim, but also that it will be irreparably harmed if no injunction issues, that the equities tip strongly in its favor, and that an injunction will serve the public interest.[26] But ALP has not established any of these elements, so the Court should deny the requested injunction.

#### 1. ALP's ballot access claim lacks merit.

ALP fails to show that it is likely to succeed on the merits of its ballot access claim because even according to its own allegations, it can achieve ballot access despite the COVID-19 pandemic with a modicum of reasonable diligence.

Federal courts "evaluate challenges to ballot access laws under the First and Fourteenth Amendments using the balancing framework in *Anderson v. Calabrezze*[27] and *Burdick v. Takushi*.[28] The balancing framework is a 'sliding scale'—the more severe the burden imposed, the more exacting [the] scrutiny; the less severe, the more relaxed [the] scrutiny."[29] When the burden is severe, the State's law must be narrowly tailored to advance a "compelling" interest, but "[a] state may justify election regulations imposing

---

26 *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013) (citing *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

27 460 U.S. 780 (1983).

28 504 U.S. 428 (1992).

29 *De La Fuente v. Padilla*, 930 F.3d 1101, 1105 (9th Cir. 2019) (citations omitted).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 11 of 19

a lesser burden by demonstrating the state has 'important regulatory interests.'"[30]

Notably, ALP does not challenge the constitutionality of Alaska's signature requirement for limited political party status under normal circumstances, conceding that "[i]n normal election years, these requirements pose modest burdens that Plaintiffs have historically and routinely been able to achieve." [Dkt. 5 at 8] Nor would such a challenge have any merit, because the Ninth Circuit has upheld equally or even more burdensome signature-gathering requirements, including California's requirement that an independent candidate collect signatures from one percent of all *registered voters*.[31]

Instead, ALP posits that the COVID-19 pandemic has transformed an otherwise "modest burden" into an unconstitutionally severe burden that requires this Court's intervention. But this claim is not borne out by the facts. As ALP's own evidence demonstrates, it has more than enough time to gather the necessary signatures before the August 5 submission deadline—its required target of *nine* signatures per circulator per day is hardly onerous as shown by Mr. Kohlhaas's collection of 56 signatures in three-and-a-half hours on an afternoon in late May. [Dkt. 5-1 at 2, ¶ 7.]

The State acknowledges that COVID-19 may have made signature gathering more difficult this year, but ALP's allegations do not show a severe burden under the Ninth Circuit's ballot-access cases. "In challenging ballot access regulations, parties must

---

30 *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015) (citing *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010)).

31 *See e.g.*, *De La Fuente*, 930 F.3d at 1105-06. *See also*, *Nader v. Cronin*, 620 F.3d 1214 (9th Cir. 2010) (upholding Hawaii's signature requirement of one percent of votes cast in last presidential election).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 12 of 19

articulate the nature of the burden, which 'should be measured by whether, in light of the entire statutory scheme regulating ballot access, "reasonably diligent" [parties] can normally gain a place on the ballot, or whether they will rarely succeed in doing so.'"[32] ALP argues that the unique circumstances this year render any consideration of what happens in normal years inappropriate and instead asks this Court to simply look at whether "anyone else ha[s] qualified or submitted a petition under present circumstances,"[33] asserting that "here, no one in Alaska <u>*has*</u>. And unless this Court takes action, it is highly unlikely that anyone in Alaska *will*." [Dkt. 5 at 9] But ALP can qualify for ballot access this year with a modicum of diligence: each of its circulators must gather only an average of nine signatures per day. Indeed, the party's own numbers indicate their lack of diligence—ALP's "team of eight signature gatherers … have only been able to gather 149 signatures in 10 days," despite ALP's own evidence showing that much more effective efforts are possible. [Dkt. 5 at 9]

As ALP notes, some courts in other parts of the country have enjoined state ballot access laws. [Dkt. 5 at 9-10] But these decisions are very fact-specific and none of them support this Court's intervention here, where the plaintiff did not begin to gather signatures until after the State lifted its pandemic-related restrictions and faces a still very modest burden based on its own evidence. The cases that ALP cites are all distinguishable based on their respective state restrictions and timelines; notably, all

---

32 *Arizona Green Party v. Reagan*, 838 F.3d 983, 989 (9th Cir. 2016) (quoting *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008)).

33 Citing *Fair Maps Nev. V. Cegavske*, 2020 WL 2798018 at 2-3 (D. Nev. 2020).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 13 of 19

involved active signature-gathering efforts in the face of existing stay-at-home orders.

To start, *Democratic National Committee v. Bostelman*,[34] is irrelevant because it had nothing to do with signature-gathering efforts for ballot access; instead, it involved a primary election in early April. Moreover, the U.S. Supreme Court immediately stayed part of the *Bostelman* injunction on the grounds that the "District Court contravened this Court's precedents … This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."[35]

The other cases ALP cites involved signature gathering in vastly different contexts, one of which—*Esshaki v. Whitmer*—has already been distinguished by the court that decided the case.[36] *Esshaki* concerned a Michigan rule under which candidates could access the primary ballot only by turning in a sufficient number of qualified signatures by April 21, when a stay-at-home order issued March 23 was still in place.[37] Because Michigan requires that nominating petition signatures be collected in-person and be witnessed by a circulator, the stay-at-home order made any signature gathering impossible.[38] The Sixth Circuit later distinguished its *Esshaki* in an Ohio case, observing that "none of Ohio's pandemic response regulations changed the status quo on the

---

34 2020 WL 1638374 (W.D. Wis., April 2, 2020).

35 *Republican National Committee v. Democratic National Committee*, -- U.S. --, 140 S.Ct. 1205 (2020).

36 *See Thompson*, 959 F.3d 804, 809.

37 *Esshaki v. Whitmer*, 2020 WL 2185553 at 1 (6th Cir. 2020).

38 M.C.L.A. 168.544c.

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 14 of 19

activities Plaintiffs could engage in to procure signatures for their petitions."[39]

As for the other cases, in *Libertarian Party of Illinois v. Pritzker*, the court emphasized the fact that the signature-gathering window began after Illinois' stay-at-home order was already in place, with no end in sight for the stay-at-home order.[40] In *Garbett v. Herbert*, Utah's signature submission deadline was April 13, and a stay-at-home directive had issued two weeks earlier.[41] Lastly, in *Fair Maps Nevada v. Cegavske,* Nevada had a stay-at-home order in place from March 30 to May 9, and the statutory deadline for turning in signatures for the initiative petition was June 24.[42] Nevada requires an initiative petition to be signed by a large percentage of voters,[43] and the court relied on the existence of a constitutional deadline that is later than the June 24 statutory deadline in deciding to enjoin the deadline, while also leaving in place the in-person signature requirement.[44]

Each case was decided on its specific facts in the midst of ongoing stay-at-home orders. The facts of this case, by contrast, show a much lesser burden: Alaska's signature

---

39 *Thompson*, 959 F.3d 804, 809 (distinguishing its decision in *Esshaki v. Whitmer*, 2020 WL 2185553 (6th Cir. 2020) involving Michigan's ballot access and stay-at-home orders, finding that Ohio specifically allowed activities for gathering signatures. "So none of Ohio's pandemic response regulations changed the status quo on the activities Plaintiffs could engage in to procure signatures for their petitions.").

40 *Libertarian Party of Illinois v. Pritzker*, 2020 WL 1951687 at 4 (N.D. Ill. 2020).

41 *Garbett v. Herbert*, 2020 WL 2064101 at 1 (D. Utah 2020).

42 *Fair Maps Nevada v. Cegavske*, 2020 WL 2798018 at 2-3 (D. Nev. 2020).

43 *Id.* at 2.

44 *Id.* at 16.

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 15 of 19

threshold is relatively minimal (one percent); signatures need not be gathered in person; ALP could have started its signature-gathering efforts over a year ago; Alaska's stay-at-home order was lifted before ALP even began gathering signatures; and the August 5 deadline provides much more time than any of the cases ALP cited. ALP has thus failed to establish that under the circumstances in Alaska, a "reasonably diligent" party could not gather sufficient signatures to gain ballot access if the party actually has the "modicum of support" necessary to warrant such access, and thus, it has not shown that the law creates more than a de minimis burden on its constitutional rights.

As a result, the State need only show that its signature-gathering requirements and deadline serve "important regulatory interests."[45] And this burden is easily met, because the Ninth Circuit has repeatedly held that signature-gathering laws serve the important regulatory interests of "preventing voter confusion, ballot overcrowding, and frivolous candidacies."[46] And the Supreme Court long ago recognized "the important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot."[47]

Because the burden on ALP is slight and the State's important regulatory interests are not seriously in question—after all, ALP concedes that the law is constitutional under normal conditions—the party cannot show probable success on the merits.

---

[45] *Arizona Green Party v. Reagan*, 838 F.3d 983, 991 (9th Cir. 2016) (quoting *Burdick*, 504 U.S. at 434.)

[46] *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1093 (9th Cir. 2019).

[47] *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 16 of 19

### 2. ALP has not established irreparable harm absent an injunction, and the balance of the equities and the public interest favor not suspending the signature-gathering requirement.

ALP claims that it will be irreparably harmed absent an injunction based on its expectation that it will fail to gather sufficient signatures and will be denied access to the general election ballot. [Dkt. 5 at 7] But this kind of speculative harm is not enough to warrant a preliminary injunction. Rather a plaintiff "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction."[48] Given the modest number of signatures its circulators must gather each day and the fact that it has more than twice as many registered voters as it needs signatures, [Dkt. 1 at 1] it is far from clear that the party will not meet the required threshold. And moral hazard complicates the situation: ALP does not just fear that it may fail to reach its target, it wishes to be relieved of the burden of even *trying* to reach it. Notably, the very relief requested by ALP—suspension of the signature requirement—was soundly rejected by all of the district court opinions ALP cites as favorable precedent. [49]

---

48 *Alliance for the Wild Rockies v. Cottrell*, 632 F.2d 1127, 1131 (9th Cir. 2011).

49 *Libertarian Party of Illinois v. Pritzker*, 2020 WL 1951687 (N.D. Ill. 2020) (court acknowledged that "[s]uspending entirely the signature requirement without requiring candidates to otherwise demonstrate historical support would. . . extend far beyond these typical variations."); *Garbett v. Herbert*, 2020 WL 2064101 (D. Utah 2020) (court rejected request to automatically allow candidate on the ballot, recognizing that "[t]he State has an important interest in ensuring candidates demonstrate a modicum of voter support before securing a place on a ballot."); *see also Fair Maps Nevada v. Cegavske*, 2020 WL 2798018 (D. Nev. 2020) ("the relief Plaintiffs seek as to the In-Person Requirements generally requires the Court to get impermissibly in the weeds of designing election procedures because Plaintiffs ask the Court to order the Secretary to set up a system for collecting and verifying signatures offered to support an initiative petition electronically, for the first time, immediately."); *Esshaki v. Whitmer*, 2020 WL 2185553

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 17 of 19

Because the burden established by ALP is so slight and the moral hazard apparent, the balance of equities here tips strongly in favor of the State. The State should not be enjoined from enforcing its ballot access laws simply because ALP would prefer not to commit its resources to meeting the requirements. Nor is it in the public interest to suspend election laws whenever background circumstances that are not within the State's control of the State make them more difficult to comply with than usual. The U.S. Supreme Court has long held that changing election laws on the eve of an election is disfavored, and recently reiterated this principle during this pandemic.[50]

## V. CONCLUSION

Because ALP has not established its entitlement to a preliminary injunction, this Court should deny its motion. The Court should also dismiss this case because ALP lacks standing or, alternatively, because ALP's complaint fails to state a claim under F.R.C.P. 12(b)(6) because Alaska's ballot access laws do not infringe on ALP's First Amendment rights, even under the unique circumstances of the COVID-19 epidemic.

---

(E.D. Mich. 2020) ("Simply put, federal courts have no authority to dictate to the States precisely how they should conduct their elections.").

50 *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S.Ct 5 (2006); *Republican National Committee v. Democratic National Committee*, -- U.S. --, 140 S.Ct. 1205 (2020).

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 18 of 19

DATED June 29, 2020.

KEVIN G. CLARKSON
ATTORNEY GENERAL

By: */s/ Margaret Paton-Walsh*
Margaret Paton-Walsh
(AK Bar No. 0411074)
Cori Mills
(AK Bar No. 1212140)
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov
cori.mills@alaska.gov

**CERTIFICATE OF SERVICE**

I certify that on June 29, 2020, the foregoing document was served electronically on all parties via CM/ECF.

*/s/ Margaret Paton-Walsh*
Margaret Paton-Walsh
Assistant Attorney General

*Alaska Libertarian Party, et al. v. Gail Fenumiai, et al.* Case No. 3:20-cv-00127-JWS
Opp. to Mot. for Prelim. Inj. & Cross-Mot. to Dismiss Page 19 of 19